UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTHONY TEPEDINO,<br><br>Defendant. | **SEALED INDICTMENT**<br><br>25 Cr.<br><br>**25 CRIM 562** |

## Overview

1.  From at least in or about 2018 through in or about 2024, ANTHONY TEPEDINO, the defendant—the chief executive officer ("CEO"), founder, and sole shareholder of a telecommunications construction and engineering company (the "Construction Company")—engaged in a series of schemes to defraud the Construction Company's largest customer (the "Victim Company"), the Construction Company's largest creditor (the "Victim Bank"), and the Construction Company itself. To carry out these schemes, TEPEDINO and others formed shell companies, created fake invoices, and looted the Construction Company of more than $5 million. TEPEDINO used those embezzled funds to bribe an employee of the Victim Company and to make millions of dollars in payments to himself, his relatives, and his creditors.

2.  The Construction Company was in operation for over a decade. Over the years, and particularly following the COVID-19 pandemic, the Construction Company experienced a series of cash-flow problems and significant year-to-year volatility in its profitability. At the same time, the Construction Company earned up to hundreds of millions of dollars in revenue annually and employed, at its peak, more than 500 people. ANTHONY TEPEDINO, the defendant, disregarded the interests of his hundreds of employees and the Construction Company's creditors and abused his position as the CEO of the Construction Company to fund his lavish lifestyle and to commit commercial bribery, bank fraud, wire fraud, and aggravated identity theft.

3. First, ANTHONY TEPEDINO, the defendant, stole more than $5 million from the Construction Company through a series of lies and false documents. TEPEDINO accomplished this fraud with the help of a co-conspirator ("CC-1"), who was an employee of the Construction Company. TEPEDINO and CC-1 conspired to submit false invoices to the Construction Company, in order to generate fraudulent payments to a non-operational shell company ("Shell Company-1") controlled by CC-1. To conceal their involvement in this scheme, TEPEDINO and CC-1 falsely claimed that Shell Company-1 was owned by a third party ("Individual-1") and had CC-1 impersonate Individual-1 when communicating with the Construction Company on behalf of Shell Company-1.

4. Second, ANTHONY TEPEDINO, the defendant, used the money he stole from the Construction Company to fund more than $1 million in commercial bribe payments to a second co-conspirator ("CC-2"), who was a senior manager at the Victim Company. These bribe payments were made in exchange for CC-2 steering new contracts worth millions of dollars to the Construction Company, assigning work to the Construction Company, and approving invoices submitted by the Construction Company.

5. Third, ANTHONY TEPEDINO, the defendant, defrauded the Victim Bank by causing it to issue more than $18 million in business credit and loans to the Construction Company using false and fraudulent information about the Construction Company's payments to Shell Company-1, namely, that those payments were for *bona fide* business expenses. In truth, these payments were simply a means for TEPEDINO to steal from the Construction Company, to fund his bribe payments to CC-2, and to enrich himself and fund his own lavish lifestyle. TEPEDINO also committed fraud on the Victim Bank by fraudulently failing to disclose that that the hundreds

2

of millions of dollars that the Construction Company was earning from the Victim Company were procured in part through TEPEDINO's bribery of CC-2.

6. Finally, in an effort to avoid being held accountable for his crimes, ANTHONY TEPEDINO, the defendant, attempted to engage in witness tampering. After learning of the existence of a federal investigation into his conduct, TEPEDINO attempted to cause CC-1 and CC-2 to falsely claim that TEPEDINO's embezzlement of corporate funds through Shell Company-1 was justified by invoices submitted by Shell Company-2, and that TEPEDINO's bribe payments to CC-2 were in exchange for legitimate consulting services.

### Relevant Individuals and Entities

7. ANTHONY TEPEDINO, the defendant, was at all relevant times the founder, CEO, and sole shareholder of the Construction Company, which was incorporated in New York in or about 2009 and was based in New Jersey. The Construction Company ceased operations and terminated its approximately 500 employees in or about August 2025, citing issues with the company's "funding partners."

8. During the relevant period, the Victim Company was a global telecommunications company based in Manhattan, New York, and the Construction Company's the largest customer. From in or about January 2019 through in or about November 2024, the Victim Company paid more than $345 million to the Construction Company for work performed in New York. These payments from the Victim Company accounted for up to 90% of the Construction Company's revenues during the relevant period.

9. From in or about 1996 through in or about 2015, CC-1 worked for the Victim Company. In or about 2015, CC-1 retired from the Victim Company and began working for the Construction Company, where CC-1 remained employed until the Construction Company ceased

operations in or about August 2025. In or about January 2018, CC-1 formed Shell Company-1, a single-member limited liability company incorporated in New York. Shell Company-1 had no employees, no operations, and no property holdings. CC-1 controlled Shell Company-1's bank account (the "Shell Company-1 Bank Account").

10. From in or about 1991 through in or about late 2024, CC-2 was employed by the Victim Company. CC-2 rose through the ranks to become a senior manager. In or about May 2019, CC-2 caused a limited liability company to be formed in New York State ("Shell Company-2"). Shell Company-2 had no employees, no operations, and no property holdings.

11. The Victim Bank was at all relevant times headquartered in Manhattan and insured by the U.S. Federal Deposit Insurance Corporation.

### TEPEDINO and CC-1 Defrauded the Construction Company of Millions of Dollars

12. Over the course of several years, ANTHONY TEPEDINO, the defendant, and his employee, CC-1, worked to defraud the Construction Company of more than $5 million. TEPEDINO used these funds to enrich himself, to pay CC-1 for his participation in the scheme, and as described below, to pay more than $1 million in bribes to CC-2, in exchange for CC-2 steering lucrative contracts and payments from the Victim Company to the Construction Company.

13. In or about late 2017 or early 2018, ANTHONY TEPEDINO, the defendant, approached CC-1 with an idea to secretly funnel corporate funds belonging to the Construction Company to a shell company controlled by CC-1. TEPEDINO explained the scheme as a way for TEPEDINO to access corporate funds from the Construction Company without TEPEDINO disclosing his personal business to the company's finance department. TEPEDINO also suggested the scheme as a way for CC-1 to earn extra money. CC-1 agreed to assist TEPEDINO in the scheme.

4

14.     ANTHONY TEPEDINO, the defendant, and CC-1 worked together to obtain funds from the Construction Company through a variety of false and fraudulent statements and documents, including emails, invoices, and other documents falsely claiming that Shell Company-1 was controlled by Individual-1 (who was a real person) and performed legitimate work for the Construction Company.  In truth, Shell Company-1 was controlled by CC-1, had no operations, and performed no work for the Construction Company.  These fraudulent communications were critical to TEPEDINO's use of Shell Company-1 to divert corporate funds, because they concealed the involvement of both TEPEDINO and CC-1 in Shell Company-1 and made Shell Company-1 falsely appear as though it was a third-party company dealing at arm's length with the Construction Company.

15.     ANTHONY TEPEDINO, the defendant, and CC-1 engaged in this scheme to divert funds from the Construction Company for several years, with TEPEDINO encouraging CC-1 to pose as Individual-1 and to seek fraudulent payments from the Construction Company as recently as at least in or about 2024.  During the course of the scheme, TEPEDINO took steps to ensure that CC-1 was the Construction Company employee responsible for managing the Construction Company's "relationship" with Shell Company-1, in order to prevent other employees of the Construction Company from discovering the scheme.

16.     ANTHONY TEPEDINO, the defendant, spent more than $2.5 million of the $5 million that he funneled from the Construction Company to Shell Company-1 by transferring or causing CC-1 to transfer money to accounts associated with TEPEDINO, TEPEDINO's relatives, and TEPEDINO's creditors.  For example, from in or about 2018 through in or about 2024, TEPEDINO made or caused the following payments to be made from the Shell Company-1 Bank Account:

5

      a.      Approximately $1.6 million in payments to accounts held in TEPEDINO's name, which TEPEDINO then used to make hundreds of thousands of dollars in credit card payments, to fund further transfers to other companies owned by TEPEDINO, and to fund cash withdrawals, among other spending.

      b.      Approximately $730,000 in payments for goods and services relating to home construction, landscaping, and pool installation, including to vendors that performed significant renovations on TEPEDINO's home in New Jersey.

      c.      More than $110,000 in payments to luxury event venues, and to a seller of custom wedding invitations.

      d.      Approximately $47,000 in payments to companies other than the Construction Company that are or were solely owned by TEPEDINO.

      e.      Approximately $45,000 paid to a company owned by a relative of TEPEDINO.

      f.      Approximately $7,000 paid to one of TEPEDINO's adult children.

      g.      Approximately $4,600 paid to TEPEDINO's spouse.

17.      In addition to these funds, ANTHONY TEPEDINO, the defendant, used the money that he funneled from the Construction Company to pay more than $1 million in bribes to CC-2, an employee of the Victim Company, in exchange for lucrative contracts and job assignments from the Victim Company, as described in detail below.

### TEPEDINO Bribed CC-2 and Defrauded the Victim Company

18.      Approximately two years into his scheme with CC-1, ANTHONY TEPEDINO, the defendant, began making bribe payments to CC-2, who at the time was an employee of the Victim Company. TEPEDINO made these payments in exchange for CC-2, among other things, steering

new contracts from the Victim Company to the Construction Company, assigning work from the Victim Company to the Construction Company, and approving the Construction Company's invoices for payment from the Victim Company.

19.     Efforts by ANTHONY TEPEDINO, the defendant, to enrich himself and the Construction Company through bribe payments to CC-2 were extremely successful. In the year immediately before TEPEDINO began bribing CC-2, the Construction Company earned approximately $37.5 million in revenue from the Victim Company. In the ensuing years—when TEPEDINO was bribing CC-2—these earnings increased significantly, reaching a peak of approximately $74.4 million in 2023. In other words, the Construction Company's annual revenue from work for the Victim Company nearly doubled after Tepedino began bribing CC-2. In total, the Victim Company paid the Construction Company more than $300 million during the approximately four years that Tepedino was bribing CC-2.

20.     As the Construction Company's earnings from the Victim Company increased, so too did the bribe payments that ANTHONY TEPEDINO, the defendant, made to CC-2. In 2020, the first year that TEPEDINO bribed CC-2, TEPEDINO paid CC-2 approximately $84,000, during a year when the Construction Company was paid approximately $37.5 million by the Victim Company. The bribe payments to CC-2 increased year-over-year in 2021, 2022, and 2023. The payments to CC-2 peaked in 2023 at approximately $525,000. As noted above, the Construction Company's earnings from the Victim Company also peaked in 2023. By September 2024, after TEPEDINO learned of the existence of a federal investigation into his conduct, TEPEDINO ceased making bribe payments to CC-2.

21.     ANTHONY TEPEDINO, the defendant, masked his bribe payments to CC-2 by routing them to Shell Company-2. TEPEDINO did so in at least two ways: (1) directly, from the

7

Construction Company and a related entity owned by TEPEDINO, and (2) indirectly, through Shell Company-1, which was funded exclusively by the Construction Company and a related Construction Company entity.

22. ANTHONY TEPEDINO, the defendant, made bribe payments to CC-2 with the knowing assistance of CC-1, as well as with the help of unwitting employees of the Construction Company. TEPEDINO regularly communicated with CC-1 about the status of payments being made to CC-2, including by confirming the balance owed to CC-2 out of the Shell Company-1 Bank Account and the remaining amount available to TEPEDINO for his own personal use. In one such written communication, CC-1 informed TEPEDINO that CC-2 was owed $100,000 out of the Shell Company-1 Bank Account and that, "after we grease ... [CC-2's] palms", TEPEDINO would have more than $220,000 available in the bank account for his personal use.

23. As ANTHONY TEPEDINO, the defendant, had done with CC-1, TEPEDINO caused CC-2 to submit to the Construction Company and Shell Company-1 fraudulent invoices to justify payments being made to Shell Company-2 by both the Construction Company and Shell Company-1. TEPEDINO told CC-2 how much to bill, how often, and provided billing codes for CC-2's use on fraudulent invoices.

24. When ANTHONY TEPEDINO, the defendant, caused the Construction Company to make fraudulent payments to Shell Company-1—which never performed *any* services for the Construction Company, the Victim Company, or any other company—TEPEDINO was generally cutting into the Construction Company's profits. The Construction Company charged the Victim Company to complete particular job assignments based on contract rates agreed upon by the parties, including agreed upon hourly rates for specific tasks required to complete the job. These contract rates included some markup over the actual cost of the Construction Company's goods

8

and services, such that the Construction Company would make a profit when performing work for the Victim Company. The Construction Company could perform the work itself, or could pay for a subcontractor to perform the work. The Construction Company was not required to, and did not, obtain the Victim's Company approval for subcontractor invoices. If the Construction Company spent more than it had agreed to charge the Victim Company on a particular project, including because of unexpectedly high costs for subcontracting a piece of the work, the Construction Company would generally earn less profit on the job or—if the costs were high enough—would suffer a loss. Here, by falsely claiming that Shell Company-1 had done subcontracting work on Victim Company projects (it had not), TEPEDINO was stealing from and reducing the profits that the Construction Company would have otherwise earned on those projects.

25. On other occasions, however, ANTHONY TEPEDINO, the defendant, baked the cost of his embezzlement into the amount that the Construction Company was bidding to perform work for the Victim Company. In this scenario, Shell Company-1 still performed *no work*—it never had any real operations—but instead of simply stealing from the Construction Company's profits, TEPEDINO was charging the Victim Company an additional markup to fund his fraudulent payments to Shell Company-1. For example:

    a. On or about January 25, 2023, CC-1 texted TEPEDINO, explaining that "[CC-2] had us do emergency" work at a particular job site on behalf of the Victim Company. CC-1 then asked TEPEDINO: "am I bumping that one up for [Shell Company-1] or *playing it legit* with regular markup only like a normal [Tepedino Company] job?" (Emphasis added). TEPEDINO responded: "Bump it up !!!!"

9

      b.      Several days later, on or about January 30, 2023, CC-1 told TEPEDINO in a text message that the estimated cost for the work would be "about 50k" and "If we mark-up 50% about 75k legit." CC-1 then texted TEPEDINO: "How much more to [Shell Company-1] if any?". TEPEDINO responded "10", meaning $10,000.

      c.      Thereafter, CC-1 confirmed to TEPEDINO that Shell Company-2 had billed the Construction Company $90,000 for the job. CC-1 also noted that CC-2's portion—or CC-2's cut of that payment—was "30k".

26.      The corrupt agreement between ANTHONY TEPEDINO, the defendant, and CC-2 violated contractual duties that the Construction Company owed to the Victim Company, including contract provisions prohibiting the Construction Company from engaging in bribery, other legal violations, and conflicts of interest with the Victim Company. TEPEDINO personally signed numerous contracts between the parties containing such provisions. Likewise, the bribery scheme violated CC-2's own obligations to the Victim Company.

27.      ANTHONY TEPEDINO, the defendant, had personal experience with the Victim Company's prohibition on improper gift-giving by its suppliers. For example, in or about 2019, TEPEDINO wrote a letter to the Victim Company stating that the Construction Company's relationship with the Victim Company had been built on "trust and ethics"; that "[i]n prior years, [the Construction Company] spared no expense during the holidays to reward your contributions"; but that "unfortunately, our intentions may have been misconstrued as something other." TEPEDINO stated his intention to "make appropriate arrangements" that year to "cater[] an office breakfast for [the Victim Company] and its teams to show our gratitude for all that you do." The Victim Company refused this offer by TEPEDINO, based on its internal ethics rules.

28.　ANTHONY TEPEDINO, the defendant, took calculated steps to conceal his illicit relationship with CC-2 from the Victim Company. For example, after TEPEDINO accidentally sent an incriminating email to CC-2's work email address at the Victim Company—rather than to CC-2's personal email address—TEPEDINO texted CC-2 to alert him to the mistake and, separately, made two attempts to recall the email. Several minutes after these recall attempts, TEPEDINO sent a cover-up email to CC-2's work email address, claiming that the original email had been inadvertently sent to the "wrong person" and asking CC-2 to "disregard."

### TEPEDINO Defrauded the Victim Bank

29.　Beginning in or about late 2021 and continuing through early 2022, ANTHONY TEPEDINO, the defendant, sought more than $18 million in commercial credit from the Victim Bank on behalf of the Construction Company. As part of this credit application, TEPEDINO made and caused to be made materially false statements and omissions regarding: (a) the Construction Company's relationship with Shell Company-1; and (b) TEPEDINO's dealings with CC-2. The Victim Bank relied on the misrepresentations and omissions in ultimately granting the Construction Company's credit application. The Construction Company has since ceased operations, thus defaulting on its obligations to the Victim Bank.

30.　First, with respect to Shell Company-1, ANTHONY TEPEDINO, the defendant, caused the Victim Bank to communicate about the Construction Company's books and records with two certified public accountants—respectively, the Construction Company's then-chief financial officer and an outside consultant (the "Tepedino Company Accountants"). The Construction Company Accountants represented to the Victim Bank, in substance and in part, that Shell Company-1 was a surveyor or subcontractor for the Construction Company and that that Shell Company-1 was owed approximately $800,000 in past due payments by the Construction

11

Company for work performed in connection with the Victim Company's projects. These statements to the Victim Bank were made based on false information that ANTHONY TEPEDINO, the defendant, provided to the Construction Company Accountants or to others at the Construction Company with whom the Construction Company Accountants communicated. As described above, TEPEDINO knew that Shell Company-1 had no legitimate dealings with the Construction Company because TEPEDINO knew that he and CC-1 were using it as a vehicle to funnel corporate funds away from the Construction Company.

31.     Second, ANTHONY TEPEDINO, the defendant, caused materially misleading statements and fraudulent omissions to be made to the Victim Bank concerning CC-2. Specifically, while offering CC-2 as a reference to vouch for the relationship between the Construction Company and the Victim Company—which the Victim Bank had identified as a credit risk for the Construction Company—TEPEDINO failed to disclose a critical fact about this relationship, namely, the secret payment arrangement between TEPEDINO and CC-2.

32.     The Victim Bank relied on the Construction Company's affirmative misrepresentations and fraudulent omissions about Shell Company-1 and CC-2 in deciding to extend credit to the Construction Company. Had the Victim Bank known the truth about these topics, the Victim Bank would have denied the credit application.

### TEPEDINO Attempted to Tamper with Witnesses

33.     On or about September 4, 2024, federal agents seized a cellphone from ANTHONY TEPEDINO, the defendant, pursuant to a judicially authorized search warrant. Federal agents also served TEPEDINO with grand jury subpoenas in his individual capacity and as a corporate records custodian for the Construction Company. That same day, and in the weeks thereafter, federal agents executed additional search warrants, and served additional grand jury subpoenas,

for cellphones and documents associated with relevant individuals and entities, including, but not limited to, CC-1 and CC-2.

34.     In response to these investigative steps, in or about 2024 and 2025, ANTHONY TEPEDINO, the defendant, engaged in a series of actions in an attempt to corruptly influence the testimony of potential witnesses, specifically, CC-1 and CC-2.

35.     Shortly after his cellphone was seized by federal agents, ANTHONY TEPEDINO, the defendant, had a telephone call with CC-2 during which they discussed CC-2's receipt of a grand jury subpoena that referenced Shell Company-2. TEPEDINO told CC-2, in substance and in part, that TEPEDINO had been searched by federal agents. TEPEDINO further conveyed to CC-2, in substance and in part, that the fake invoices CC-2 had generated for Shell Company-2 could serve as cover for the bribe and kickback payments that TEPEDINO made to CC-2.

36.     Similarly, shortly after his telephone call with CC-2, ANTHONY TEPEDINO, the defendant, had a telephone call with CC-1 in which TEPEDINO stated, in substance and in part, that TEPEDINO's cellphone had been seized by federal agents; that CC-2 had also been approached by law enforcement; and that federal agents had asked CC-2 about Shell Company-2. TEPEDINO and CC-1 later arranged to meet in person in TEPEDINO's office. During that meeting, TEPEDINO closed his office door, instructed CC-1 to turn off his cellphone, turned off his own cellphone, and played audio at a loud volume on his computer. TEPEDINO took CC-1 into a corner of the room and stated, in substance and in part, that there would not be a problem with law enforcement if TEPEDINO and CC-1 kept their stories straight, specifically, that payments to Shell Company-2 were for boutique consulting services provided by CC-2. CC-1 understood TEPEDINO to be suggesting that CC-1 adopt a false narrative to explain the bribe and kickback payments that TEPEDINO had made to CC-2.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud)

The Grand Jury charges:

37. The allegations contained in paragraphs 1 through 36 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

38. From at least in or about 2017 through in or about 2024, in the Southern District of New York and elsewhere, ANTHONY TEPEDINO, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

39. It was a part and an object of the conspiracy that ANTHONY TEPEDINO, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, TEPEDINO agreed to and did engage in a scheme with CC-1 and CC-2 to fraudulently obtain money from the Construction Company by submitting false statements and representations about Shell Company-1 and Shell Company-2 in order to induce the Construction Company to issue payments to Shell Company-1 and Shell Company-2, and TEPEDINO sent and received, and caused others to send

and receive, electronic transfers of funds and electronic communications, including emails, telephone calls, and text messages, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

40. It was further a part and object of the conspiracy that ANTHONY TEPEDINO, the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and to deprive the Victim Company of its intangible right to the honest services of CC-2, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, TEPEDINO agreed to and did pay bribes and kickbacks to CC-2 in exchange for CC-2, among other things, steering new contracts from the Victim Company to the Construction Company, assigning work from the Victim Company to the Construction Company, and approving invoices from the Construction Company for payment from the Victim Company, and TEPEDINO sent and received, and caused others to send and receive, electronic transfers of funds and electronic communications, including emails, telephone calls, and text messages, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 36 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

15

42.     From at least in or about 2017 through at least in or about 2024, in the Southern District of New York and elsewhere, ANTHONY TEPEDINO, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, TEPEDINO engaged in a scheme with CC-1 and CC-2 to fraudulently obtain money from the Construction Company by submitting false statements and representations about Shell Company-1 and Shell Company-2 in order to induce the Construction Company to issue payments to Shell Company-1 and Shell Company-2, and TEPEDINO sent and received, and caused others to send and receive, electronic transfers of funds and electronic communications, including emails, telephone calls, and text messages, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Honest Services Wire Fraud)

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 36 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

44.     From at least in or about 2018 through in or about 2024, in the Southern District of New York and elsewhere, ANTHONY TEPEDINO, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and to deprive the Victim Company of its intangible right to the honest services of CC-2, transmitted and caused to be transmitted by means

16

of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TEPEDINO paid bribes and kickbacks to CC-2 in exchange for CC-2, among other things, steering new contracts from the Victim Company to the Construction Company, assigning work from the Victim Company to the Construction Company, and approving invoices from the Construction Company for payment from the Victim Company, and TEPEDINO sent and received, and caused others to send and receive, electronic transfers of funds and electronic communications, including emails, telephone calls, and text messages, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

## COUNT FOUR
### (Aggravated Identity Theft)

The Grand Jury further charges:

45. The allegations contained in paragraphs 1 through 36 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

46. From at least in or about 2018 through at least in or about 2024, in the Southern District of New York and elsewhere, ANTHONY TEPEDINO, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, TEPEDINO used and transferred the first and last name, phone number, address, and government identification of Individual-1 during and in relation to the conspiracy to commit wire fraud and honest services wire fraud, wire fraud, and honest services wire fraud

17

violations charged in Counts One, Two, and Three of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## COUNT FIVE
### (Bank Fraud)

The Grand Jury further charges:

47. The allegations contained in paragraphs 1 through 36 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

48. From at least in or about 2021 through in or about 2022, ANTHONY TEPEDINO, the defendant, and others known and unknown, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, TEPEDINO made and caused to be made material misrepresentations and omissions to the Victim Bank in order to induce the Victim Bank to issue credit and loans to the Construction Company, and in doing so, obtained and attempted to obtain moneys, funds, and property owned by and under the custody and control of the Victim Bank.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT SIX
### (Witness Tampering)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1 through 36 above are hereby repeated, alleged, and incorporated by reference as if fully set forth herein.

50. In or about 2024 and 2025, in the Southern District of New York and elsewhere,

ANTHONY TEPEDINO, the defendant, knowingly used intimidation, threatened, and corruptly persuaded another person, and attempted to do so, with intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of a federal offense, to wit, TEPEDINO met with two potential witnesses, CC-1 and CC-2, and suggested they adopt false narratives regarding facts that were the subject of a federal criminal investigation being conducted by the Federal Bureau of Investigation and other federal agencies.

(Title 18, United States Code, Section 1512(b)(3).)

## FORFEITURE ALLEGATIONS

51. As a result of committing the offenses alleged in Counts One, Two, and Three of this Indictment, ANTHONY TEPEDINO, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

52. As a result of committing the offense alleged in Count Five of this Indictment, ANTHONY TEPEDINO, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

53. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

JAY CLAYTON
United States Attorney